MICHAEL B. HORROW (SBN 162917)
SCOTT E. CALVERT (SBN 210787)
DONAHUE & HORROW, LLP
1960 E. Grand Avenue, Suite 1215
El Segundo, California 90245
Telephone: (310) 322-0300
Facsimile: (310) 322-0302
Email: mhorrow@donahuehorrow.com
Email: scalvert@donahuehorrow.com

Attorneys for Plaintiff Mark Tereba

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARK TEREBA,<br><br>  Plaintiff,<br><br> vs.<br><br>METROPOLITAN LIFE INSURANCE COMPANY; SUTTER HEALTH LONG TERM DISABILITY PLAN; DOES 1-10<br><br>  Defendants. | Case No.:<br><br>**COMPLAINT FOR BENEFITS UNDER A GROUP EMPLOYEE BENEFIT PLAN** |

– 1 –

Plaintiff alleges as follows:

1. This Court's jurisdiction is invoked pursuant to 28 U.S.C. §§1331, 1337 and 29 U.S.C. §1132(a), (e), (f) and (g), of the Employee Retirement Income Security Act of 1974, 29 U.S.C. §1001, *et seq.* ("ERISA") as it involves a claim by Plaintiff for long-term disability ("LTD") benefits under an employee benefit plan regulated and governed under ERISA. Jurisdiction is predicated under these code sections as well as 28 U.S.C. §1331, as this action involves a federal question.

2. The events or omissions giving rise to Plaintiff's claim occurred in this judicial district, thus venue is proper here pursuant to 28 U.S.C. §1391(b)(2), and the ends of justice so require.

3. The ERISA statute at 29 U.S.C. §1133, in accordance with Regulations of the Secretary of Labor, provides a mechanism for internal appeal of benefit denials. Those avenues of appeal have been exhausted.

4. Plaintiff MARK TEREBA ("Plaintiff" or "Mr. Tereba") is a resident of Stanislaus County and a citizen of the State of California, and at all relevant times was an employee of Sutter Health and a participant in its employee benefit plan, identified below.

5. Plaintiff alleges upon information and belief that Defendant METROPOLITAN LIFE INSURANCE COMPANY ("MetLife"), is, and at all relevant times was, a corporation duly organized and existing under and by virtue of the laws of the State of New York and authorized to transact and transacting the business of insurance in this state.

6. Plaintiff is informed and believes and thereon alleges that Defendant SUTTER HEALTH LONG TERM DISABILITY PLAN ("Plan") is an employee welfare benefit plan established and maintained by Sutter Health to provide its employees with monthly long-term disability ("LTD") income insurance protection, and is the Plan Administrator.

7. The true names or capacities, whether individual, corporate, associate, or otherwise, of Defendants DOES 1 through 10, are unknown to Plaintiff who therefore sues said Defendants by such fictitious names. Plaintiff is informed and believes and on such information and belief alleges that each of the Defendants sued herein as a DOE is legally responsible in some manner for the

DONAHUE & HORROW, LLP

events and happenings referred to herein, and will ask leave of this court to amend this complaint to insert their true names and capacities in place and instead of the fictitious names when the same become known to Plaintiff.

8. MetLife issued Group Policy Number 116800-1-G to Sutter Health and the eligible participants and beneficiaries of the Plan, including Mr. Tereba.

9. The Plan states that "Disability or Disabled means that as a result of Sickness or injury You are either Totally Disabled or Partially Disabled."

10. The Plan states that "Totally Disabled or Total Disability" means:

During the Elimination Period and the next 24 months, You are unable to perform with reasonable continuity the Substantial and Material Acts necessary to pursue Your Usual Occupation in the usual and customary way.

After such period, You are not able to engage with reasonable continuity in any occupation in which You could reasonably be expected to perform satisfactorily in light of Your:

- age;
- education;
- training;
- experience;
- station in life; and
- physical and mental capacity

that exists within any of the following locations:

- a reasonable distance or travel time from Your residence in light of the commuting practices of Your community;
- a distance of travel time equivalent to the distance or travel time You traveled to work before becoming disabled; or
- the regional labor market, if You reside or resided prior to becoming disabled in a metropolitan area.

11. The Plan defines "Substantial and Material Acts" as follows:

[T]he important tasks, functions and operations generally required by employers from those engaged in Your Usual Occupation that cannot be reasonably omitted or modified. In determining what substantial and material acts are necessary to pursue Your Usual Occupation, We will first look at the specific duties required by Your job. If You are unable to perform one or more of these duties with reasonable continuity, We will then determine whether those duties are customarily required of other employees engaged in Your Usual Occupation. If any specific, material duties required of You by Your job differ from the material duties customarily required of other employees engaged in Your Usual Occupation, then We will not consider those duties in determining what substantial and material acts are necessary to pursue Your Usual Occupation.

12. The Plan defines "Usual Occupation" as:

[A]ny employment, business, trade or profession and the Substantial and Material Acts of the occupation You were regularly performing for the employer when the Disability began. Usual Occupation is not necessarily limited to the specific job that You performed for the employer.

13. The Plan includes a 180-day Elimination Period.

14. Mr. Tereba began working at Sutter Health on or about February 22, 2021, and at all relevant times was covered under the Plan.

15. At the time of his disability, Mr. Tereba was working as a Clinical Lab Scientist Supervisor for Sutter Health. Mr. Tereba was working as the night laboratory supervisor, which entailed testing, supervising the entire lab, answering telephone calls, conducting microscopy work and running analyzers. The job was physical in nature, requiring constant movement, climbing and bending, in addition to the ability to perform precise testing, sometimes at great speed, often while bending over machines.

16. Mr. Tereba's last day of work was on or about June 12, 2023. At the age of 64, after suffering through years of pain caused by a bulging disc in his lower back, as well as other

– 4 –

symptoms, including, but not limited to, nerve damage and pain in his right arm, loss of strength, angina, chest and head pain, high blood pressure and chronic gout (not to mention a prostate cancer diagnosis), Mr. Tereba was forced to admit to himself that he could no longer continue working as a Clinical Lab Scientist Supervisor for Sutter Health.

17. When he could no longer work, Mr. Tereba applied for LTD benefits under the Plan. Based upon information and belief, Mr. Tereba timely filed a claim for LTD benefits under the Plan.

18. In support of his claim, Mr. Tereba submitted an Attending Physician Statement form completed by Joshua Meneses, D.O., on November 28, 2023. On the form, Dr. Meneses stated that he advised Mr. Tereba to stop working on June 12, 2023, and that Mr. Tereba was hospitalized two days later (and again on November 8, 2023). Dr. Meneses listed primary diagnosis of Z98.1 (surgical procedure, cervical spinal fusion), with secondary diagnoses of Z09 (surgical follow up) and Z95.9 (surgical procedure, arterial stent). Dr. Meneses' medical record from Dr. Tereba's November 28, 2023 visit to his office further confirmed and explained these findings.

19. In supporting Mr. Tereba's LTD claim, Dr. Meneses listed his symptoms as "pain in arm and neck" and "no strength in arm." He confirmed that, on examination, he found "decreased range of motion [with] pain" and "decreased strength [in his right] arm." Dr. Meneses further explained that the June 14, 2023 hospitalization was for the spinal surgery, while the November 8, 2023 hospitalization was for placement of the arterial stent.

20. To further support his claim, Mr. Tereba provided MetLife with copies of and access to his medical records. This included records, not only from Dr. Meneses, but also from neurosurgeon Deependra Mahato, D.O., cardiologist Shewit Weldetensae, M.D., and Anderson Physical Therapy (where he typically treated with Physical Therapist Antionette Copt). The records further confirmed that, due to the restrictions and limitations that Mr. Tereba was experiencing because of his many symptoms, he was disabled, as defined by the terms of the Plan.

21. After reviewing the available medical evidence, MetLife agreed that Mr. Tereba was "unable to perform with reasonable continuity the Substantial and Material Acts necessary to pursue [his] Usual Occupation in the usual and customary way," and accordingly approved his

– 5 –

claim for benefits. Mr. Tereba was notified of that decision by letter dated February 9, 2024, wherein MetLife stated that "[w]e've approved your disability claim starting June 14, 2023," and that, following the running of the Elimination Period, he was entitled to benefits as of December 11, 2023.

22. In the February 9, 2024 letter, Mr. Tereba was informed that he was "required to periodically submit medical information in support of his continued disability." And so he did. Over the following months, Mr. Tereba continued to provide MetLife with medical records from his treating physician in support of his ongoing LTD claim.

23. For example, following a March 12, 2024 visit with Dr. Meneses, Mr. Tereba's "Active Problems" included:

- Rotator cuff tear arthropathy of right shoulder
- Arthritis of right acromioclavicular joint
- Foraminal stenosis of cervical region
- Right arm weakness
- Benign prostatic hyperplasia
- Dyslipidemia
- Primary hypertension
- Anxiety and depression
- Encounter for preprocedural laboratory examination
- Abnormal nuclear stress test
- Chest pain
- Coronary artery disease
- [Surgical Procedure] arterial stent
- [Surgical Procedure] cervical spinal fusion
- Personal history of prostate cancer

24. This and other records showed that Mr. Tereba suffered from a variety of medical problems with all contributed to his inability to continue working as a Clinical Lab Scientist Supervisor for Sutter Health.

25. Similarly, Mr. Tereba's records from his visits to Anderson Physical Therapy reveal consistent reports of right arm and neck pain to go along with muscle wasting and atrophy of the muscles in his right shoulder. Mr. Tereba also reported moderate difficulty with most tasks that required even a little bit of strength, such as opening a tight jar, doing heavy household chores and carrying a shopping bag. He also reported that the pain caused him difficulty sleeping.

26. The evidence that Mr. Tereba provided to MetLife was sufficient to support his assertion and claim that he was and remained disabled under the terms of the Plan.

27. However, despite this and other evidence that Mr. Tereba was, and remained disabled, by letter dated August 16, 2024, MetLife informed Mr. Tereba that it concluded that he was not entitled to benefits after the date of the letter.

28. After MetLife previously determined that Mr. Tereba was disabled and entitled to LTD benefits under the Plan, both common sense and controlling case law hold that MetLife is required to document some improvement in Mr. Tereba's condition in order to support its decision that he was no longer disabled and entitled to LTD benefits. Yet, the August 16, 2024 denial letter failed to document any improvement. Instead, the letter reveals that MetLife was completely misreading both the relevant records and the language of the Plan.

29. First, in the August 16, 2024 letter, MetLife stated that it determined he was now capable of performing the duties of a Lab Specimen Worker. However, that was not Mr. Tereba's pre-disability occupation. Rather, he was Clinical Lab Scientist Supervisor who worked 10-hour days on the night shift. Given that the Plan specifically requires a determination of whether Mr. Tereba was "unable to perform with reasonable continuity the Substantial and Material Acts necessary to pursue [his] Usual Occupation in the usual and customary way," the failure to correctly identify his occupation invalidates MetLife's entire conclusion.

30. Further, while Mr. Tereba's treating physicians included specialists in their field, including a cardiologist and neurosurgeon, MetLife failed to even have a physician review his medical records. Instead, his file was reviewed by a Nurse Clinician. In addition to not naming its in-house Nurse Clinician, MetLife failed to provide any support for its assertion that the Nurse Clinician was qualified to review the medical records.

31. Finally, the Nurse Clinician stated that, one reason they believed that Mr. Tereba's medical records no longer supported the claim for benefits is that "there are no objective findings in the medical records that would support continued restrictions." Despite MetLife's claim, Mr. Tereba did provide "objective evidence" of his disability. However, even if he had not, the Plan does not specifically require that claimants such as Mr. Tereba provide "objective evidence" of their disability, and accordingly, it is a violation of ERISA for MetLife to deny Mr. Tereba's claim based on the (false) conclusion that that he did not provide "objective evidence" of his disability.

32. Another flaw with MetLife's reliance on the unnamed Nurse Clinician is that their conclusion that Mr. Tereba was not disabled was based entirely on a "paper review" of the medical records. The Nurse Clinician never spoke with or examined Mr. Tereba. Nor did the Nurse Clinician discuss Mr. Tereba's conditions with any of his treating physicians. Instead the Nurse Clinician's opinion was based solely on a review of Mr. Tereba's medical records, which include the consistent conclusion that he was unable to continue working. Despite failing to explain why MetLife believed that the opinion of a non-examining Nurse Clinician should carry more weight than Mr. Tereba's examining and treating medical professionals who are specialists in their field, MetLife decided to place that opinion above all others.

33. Mr. Tereba timely appealed MetLife's decision to deny his claim for LTD benefits.

34. As part of Mr. Tereba's appeal, he informed MetLife about its failure to assess his LTD claim using the correct occupation and job duties. Mr. Tereba explained his physicians believed that his nerve damage, loss of strength and pain that prevented him from working were the result of a long career performing jobs that required repetitive motion. Additionally, he was experiencing chest and head pain, numbness in his thigh due to a bulging disc in his lower back, high blood pressure and gout, all of which contributed to his inability to continue to perform the material duties of his occupation, which required constant motion in a high-stress environment.

35. Mr. Tereba also provided additional medical records to support his claim, including a January 6, 2025 letter from Dr. Meneses which explained that the chronic conditions listed above left him "still unable to return to work." Mr. Tereba's medical records indicated that he suffered from anxiety and depression, on top of the physical restrictions.

36. Given all of Mr. Tereba's co-morbid conditions, if MetLife questioned the conclusions of his treating physicians that he was unable to return to work, the reasonable decision would have been to compel Mr. Tereba to appear for an IME or FCE to assess his restrictions, limitations and functional abilities in person. Instead, MetLife provided his medical records to a physician it paid for yet another "pure paper review" of Mr. Tereba's medical records. The physician affirmatively stated that he was ignoring Mr. Tereba's depression and anxiety, but opined that Mr. Tereba was not physically restricted from performing the material and substantial duties of his occupation.

37. Despite this and other evidence Mr. Tereba provided to MetLife in support of his disability claim and appeal of MetLife's erroneous and wrongful claim decision, on or about March 28, 2025, based entirely on the opinion of its paid "paper review" physician, MetLife denied Plaintiff's appeal and affirmed the prior denial.

38. As a direct and proximate result of MetLife's failure to provide Plaintiff with LTD benefits, he has been deprived of said benefits from on or about August 17, 2024 to the present.

39. Plaintiff has exhausted all required administrative remedies related to his claim, and is allowed to bring a lawsuit against Defendants, pursuant to ERISA, to recover all benefits to which he is entitled.

40. As a further direct and proximate result of the denial of benefits, Plaintiff has been required to incur attorneys' fees to pursue this action and is entitled to have such fees paid by Defendants pursuant to 29 U.S.C. §1132(g) (1), ERISA §502(g) (1).

41. A controversy now exists between the parties as to whether Plaintiff is disabled as defined in the Plan. Plaintiff seeks the declaration of this Court that he meets the Plan's definition of disability and thus he is entitled to past due disability benefits under the Plan.

WHEREFORE, Plaintiff prays for relief against Defendants as follows:

1. An award of disability benefits from August 17, 2024 to the date of judgment;
2. For reasonable attorneys' and costs fees incurred in this action; and,
3. For such other and further relief as the Court deems just and proper.

| | |
|---|---|
| DATED: September 2, 2025 | DONAHUE & HORROW, LLP |
| | *[signature]* |
| | MICHAEL B. HORROW |
| | SCOTT E. CALVERT |
| | *Attorneys for Plaintiff Mark Tereba* |

COMPLAINT FOR BENEFITS UNDER A GROUP EMPLOYEE BENEFIT PLAN